# CIRCUIT COURT OF BALTIMORE CITY.

Filed November 28, 1919.

TERRENCE McMAHON
VS.
LEVI A. THOMPSON.

*Benjamin H. McKindless* for complainant.
*Roland R. Marchant* for defendant.

GORTER, J. (Orally)—

This case has been argued with great ability, more ably argued, I think, than any case that I have heard since I have been in this court, and I am now about to state the conclusions that I have reached, although those conclusions are not very fixed.

The case is one in which the Assistant Superintendent of Public Buildings asks me to enjoin a gentleman who has been appointed by the Mayor, Superintendent of Public Buildings from interfering with the Assistant Superintendent of Public Buildings, who, in the bill, claims that he is the Superintendent of Public Buildings, and, if not, at least has been performing the duties of the Superintendent of Public Buildings. As I say, he asks me to enjoin the defendant, who has been appointed by the Mayor, from interfering with him in the discharge of his duties, and to restrain the defendant, who has been appointed by the Mayor, from taking charge of all of the property of the city that he, the plaintiff, claims he is the custodian of.

I have been referred to the case of the County Commissioners of Washington County in 77th Maryland, as a case, the law of which is conceded to be correct by the counsel on both sides. The counsel for the plaintiff contends that is the law that is applicable to his case because he says that Mr. McMahon, who was the Assistant Superintendent of Public Buildings, is the Superintendent of Public Buildings. Therefore, the law, as set forth in 77th Maryland which says that an incumbent in office, whether he be entitled to that office or not, he being an incumbent de facto, has a right to restrain anyone who claims to be the holder of the office de jure from interfering with him in the administration of the office until the claimant established his rights by legal proceedings.

That, unquestionably, is the law, and we have not much trouble with the law. It is always with the application of the facts to the law that the embarrassment that the courts have to contend with presents itself.

I think that Mr. McMahon is not the Superintendent of Public Buildings, which, to my mind, at once takes me away from the authority of the case, but I do think Mr. McMahon has taken charge, and the bill so alleges, of the property of the city and has administered the duties of the office of the office of Superintendent of Public Buildings. That is all that he could administer. I might call them the physical duties. And he is still doing that. I conceive that at the present time he and all those associated with him in administering the duties of that department of the city government would be extremely embarrassed if they did not know whether the person who claims to be appointed to that office was the one legally qualified to hold the office, and then, therefore, the one that they should obey and the one in whose hands their tenure of office is.

I have read, I think, all of the cases to which I have been referred, referred to in 77th Maryland, and by the attorneys. These cases, without exception, are cases in which the incumbent has resisted the person who was seeking to obtain the office, and, therefore, I have not found any authority, either one way or the other, where a person in the position of Mr. McMahon, as I think he is, has asked for an injunction to restrain a person who would be his superior in office, who would have a right to dismiss him and the many people associated with him in carrying out the duties of a very important branch of the city government. I say I have not found a case of that character.

Then, that at once puts me to the question of what I ought to do. And the thought came to my mind that if I thought that Mr. Thompson had been appointed legally to the office that I ought not to restrain him from taking charge of it. But, on the other hand, if I thought that he had not been legally appointed to the office, I ought to restrain him from taking charge of it, because if he were not—I am not talking about Mr. Thompson, but any one in his position,—he would have the power to cause a great deal of confusion if he attempted to dismiss the many people who held positions in that department of the city government. That then brought me to the question of whether or not Mr. Thompson had been legally appointed, and I say with considerable hesitation and doubt, with the study that I have been able to give

to the question up to the present time, and I think the question admits of more study. I have reached the conclusion that Mr. Thompson has not been legally appointed to that office, and I give my reasons, because, if they are correct, they may recommend themselves to you, and if there is any fallacy in them, you, of course, will be able to detect it.

The appointment of Mr. Thompson was made under Section 25 of the Charter. It was made—while the bill does not say so, but the fact must be admitted and I shall require them to be put in the bill—on the 18th of November. The City Council adjourned the day before, on the 17th day of November, to reassemble on the 1st of December, and the appointment was made under the provision of the Charter, as I have said, contained in Section 25. I will not read all of the preceding part, with which you gentlemen are familiar, but when it comes to vacancies in the offices which the Mayor is called upon to fill, it says: "All vacancies occurring in any of the offices which the Mayor is empowered to fill during the recess of the Second Branch, unless otherwise provided in this Charter, shall be filled by the Mayor until the next regular meeting of the Second Branch, at which meeting the Mayor shall present the name of a person for confirmation to fill said vacancy, and the mode and manner of procedure in such a case shall be the same as provided for in this section for other appointments by the Mayor and confirmation by the Second Branch."

The counsel for the plaintiff contends, first, that there was no recess, or the period lapsing between the adjournment of the Council and its meeting again was not the recess spoken of in this clause in the Charter; and, secondly, if it were the recess spoken of in this clause of the Charter, the Mayor was only allowed to appoint where a vacancy occurred in a particular recess, or in the particular recess that he was called upon to appoint, and if the vacancy occurred in some prior recess, then, as he had had an opportunity to consult with or submit his appointment to the Council, he was not authorized by this provision to appoint him, although, for the sake of the argument, the two weeks would constitute a recess.

The first question which I had to decide was whether or not these two

weeks would be a recess, such as is spoken of in this provision of the Charter. In doing that, I undertook to go back and look at the old law. I do not know whether I am stating it correctly, because I did not have all of the books. I did not have them here yesterday at my disposal, as the Bar Library was closed and I only had such books as I was able to find, but I find that in the Code of 1860, and you find the same provision in the Constitution of the State, this provision: "The regular sessions of the City Council of Baltimore, which shall be annually"—I am reading from Section 4 of Article XI of the Constitution—"shall commence on the third Monday of January of each year and shall not continue more than 90 days, exclusive of Sundays, but the Mayor may convene the Council in extra session whenever, and as often, as it may appear to him that the public good may require, but no call of extra session shall last longer than 20 days, exclusive of Sundays.

Therefore, we see that at that time the session of the City Council was just as the session of the Legislature. It was for 90 days and it commenced in January and it ran along continuously until it closed, and when I turn to Section 30 of Article IV of the Code of Public Local Laws, 1860, to the law that speaks of the appointment of the Mayor. I find this provision, which is very easy to understand in connection with the one that I have just read: "They may pass ordinances regulating the manner of appointing persons to office under the corporation"—that means the Mayor and City Council— "which they are or may be authorized by law to appoint, but unless such ordinances be passed, the Mayor shall nominate, and by and with the advice and consent of a convention of the two branches of the City Council, shall appoint all officers under the corporation, except the Register of the city and the clerks employed by the city or under its authority; the Register shall be appointed by a convention of the two branches of the City Council biennially, and shall be commissioned by the Mayor, but shall be removable at pleasure by a convention of the said two branches; *all vacancies happening during the recess of the City Council shall be filled by the Mayor until the ensuing session of the City Council.*"

I think when you read those two sections, which were put in the law at the same time, we know exactly what was meant by recess. The recess was the nine months that intervened between the adjournment of the City Council the early part of April of each year and its meeting again in the early part of January in the following year, just exactly as the recess in the Legislature, and the Governor appoints during the recess of the Legislature.

Time went along, and in the year 1888, the first section that I have read was changed, and it was changed so that it reads about as we now find it, at Section 24 of the Code of 1888: "The City Council shall meet on the second Monday of November of every year and may continue in session for 120 days, and no longer; provided, that they may by ordinances or resolution so arrange their sittings that the same may be held continuously or otherwise; provided further, that the Mayor convene the City Council in extra session," and so forth. Then when the law was thus changed so that the City Council did not meet continuously for three months, or 90 days, but met for 120 days, and could meet either continuously or not, as it determined, it seemed that nobody's attention was called to the other section in regard to the filling of vacancies, and we find that reads exactly as it did in 1860, in which after it says that the Mayor shall appoint by and with the advice and consent of the two branches of the Council in joint session, it says: "*All vacancies happening during the recess of this Council shall be filled by the Mayor until the ensuing session of the City Council.*"

Now, at once, we have a section that was not meant to apply to the state of facts of the law as amended, and if we are forced to construe it, we are at considerable loss to determine what it means.

If recess meant any period that elapsed between two sittings and the Council sat 120 times, there would be 120 recesses. If it sat, as it has been sitting, every Monday, until you come to the summer recess, you would have about 40 recesses. Certainly that provision did not mean to apply, and was not written as applicable to the law as changed by the Act of 1888.

When you come to the City Charter of 1898, we have the same provision in respect to—practically the same provision in respect to the sitting or the

session of the City Council that we have in 1888, except it begins on the Thursday after the third Monday in May, and then they have a right to sit 120 days, and they may sit either continuously or not, as they may determine. In point of fact, for a great many years they have not, as I understand, sat continuously.

When the Charter was written there was an effort to change the section which in 1888 seemed not to apply in a very sensible way to the law as changed in 1888, and we have the provision that we are concerned with in this case. It says: "All vacancies occurring in any of the offices which the Mayor is empowered to fill during the recess of the Second Branch, unless otherwise provided in 'this Charter, shall be filled by the Mayor until the next regular meeting" — session is changed to meeting — "of the Second Branch, at which meeting the Mayor shall present the names of the persons for confirmation to fill said vacancies, and the mode and manner of procedure in such a case shall be the same as provided for in this section for other appointments by the Mayor, and confirmation by the Second Branch."

Then the great question that bothered me was whether or not a recess would be created by adjournment over a number of days, or whether the recess, which was contemplated by this provision of the section, was the recess which occurs in the summer, the Council for a good many years sitting every Monday afternoon, and always adjourning over during the summer recess. We have to look at facts as they exist in order to apply the law as it is written.

I do not at all agree with Mr. McKindless that the only recess that could take place would be after the one hundred and twenty days were consumed. It seems to me that is so unreasonable that it can not be the meaning. For a considerable time yesterday I thought that recess must mean short intervals between settings, but after reading over the law, as I have read it, and seeing what it originally meant, and then taking into consideration that both under the old law and the new law the Mayor is not able to make any of these appointments without the advice and consent of the City Council, and as this right which is given him to make the appointment in case of recess

would be one where the necessity arose, and where it would be impossible, or very difficult to get the Council, I thought the reasonable interpretation, and still think up to the present time, the reasonable interpretation is that it meant the recess which we all know, although it is not stated in the bill, that takes place between, probably, June—because they must meet in May —and September in each year, the summer recess.

In reading the language again I find they have still retained the definite article "the." They say, "All vacancies occurring in any of the offices which the Mayor is empowered to fill during 'the' recess of the Second Branch shall be filled by the Mayor until the next regular meeting of the Second Branch," which only lets him fill it until the next regular meeting, still holding to what seems to be a fixed principle of not letting the Mayor make any of these appointments unless he has the advice and consent of the Second Branch of the City Council. Of course, you can take "the recess" to mean any of the recesses, although it is the definite article and not the indefinite article, and so I say, up to the present time, and I have to give you gentlemen my views today, I am of the opinion that the recess spoken of is the summer recess and not the intermissions that take place between weekly sittings, or if they adjourn over one week, because there is a holiday in that week, or for any other reason—that they are not the times the Mayor would be entitled to appoint.

So much for that. When I got through with that I came to the next question: "Has this vacancy occurred during this recess, if it be a recess?

When you read the language it certainly means that, the literal construction of the language means that. "Occur" does not mean "existing." If you read these earlier provisions they say "happening."

I think, looking at the spirit of the law, that there was not any reason to give the Mayor the power to fill the vacancy which had occurred in the previous recess because he had his opportunity, in theory, with the Council to fill it. It was not necessary to provide for a case of that kind, because in giving him the power to do it alone, it was only when he could not get his Council and when the exigencies might

have been such that it was necessary to fill the office.

Now, feeling, and I say, with considerable doubt, and I might even have left out, or omitted things, that are in this law—I certainly have given all the time I could to it, feeling as I do, my conclusion is only the conclusion I have reached up to the present time. This decision is not going to settle anything one way or the other.

We come to a broader consideration: This is an age of restlessness and it did seem to me that courts ought to be able to perform their functions, that if a man was entitled to an office the courts ought to be able to say that he was entitled to it, and if he were not entitled to the office the courts to be able to say that he was not entitled to it, and the community ought not be left in great uncertainty as to whether or not a man who was appointed to an office, a very responsible office, having the power of removal and appointment of a great many people—not that I for a minute intimate, or think, that he would abuse it, but I must deal with the question in a general way and not as applicable to the particular case I have to deal with—was entitled to hold it. Therefore, considering that this was a question of considerable public moment, and feeling, as I do, up to the present time, that he is not entitled to it, I felt that courts ought to be able to adjudicate that question and if Mr. Thompson is entitled to the office he ought to have it, and there ought not to be any doubt about it, and if he is not entitled to the office we ought to know he is not entitled to it, and the hundreds of people under him ought to know whether he is over them with the right to give commands to them, and with the power to remove them, so they would have the peace of mind, and we would have, to that extent, this uncertainty in the community removed.

Feeling that way, and after talking over the matter with another judge, I thought that I ought to entertain this case, and as I think up to the present time that Mr. Thompson is not entitled to the office that I ought not to say that I would not act.

I am willing to say this, that if Mr. Thompson will bring a mandamus against either Mr. McMahon—of course, I do not wish to give any advice, but I am only saying what I am willing to do and against Mr. Hogan, if Mr. Marchant thinks that Mr. Hogan has a higher claim to control of this office than Mr. McMahon, I would be very willing to ask two of the judges to sit with me and to carry both of the cases along together, and finally decide the question and allow the question at once to be taken to the Court of Appeals and let the issue be determined of whether or not Mr. Thompson is entitled to this office. I do not ask, of course, that you should bring it to me with the other judges. I would certainly have no objection to the City Solicitor selecting his judge in the mandamus case, if he concluded that was the proper thing to do. We could take both of the cases along together and have the matter determined. I suggest that because I do feel that if Mr. Thompson is entitled to this office he ought to have it, and if he is not entitled to it, all those people working in that department of the government ought not to be subject to his orders, or have the uncertainty put upon them as to their tenure of office, although there might not be any uncertainty in point of fact.

Of course, when I say these things I do not mean to ask you to do it. You can do what you think is for the best interest of your respective clients.

These being my views, I think, I have said pretty much all I want to say. However, the plaintiff ought to amend his bill by stating categorically, although I think he has stated it in a way, that Mr. McMahon is performing the duties of the Superintendent of Public Buildings.

I think he also ought to state how the appointment was made—"not that it was not made at recess"—but give the facts as I have stated them about this appointment. I will allow that amendment before I pass on the demurrer, and then when I pass on the demurrer I will overrule the demurrer and give Mr. Marchant leave to put in his answer and reply, if he desires to do so.

I want to say that this is not a case that at all determines whether Mr. Thompson is—at least it might not—I do not know whether it does or not—entitled to that office, but up to the position that I am now in, in ruling on the demurrer, it certainly does not. Whether at the end a court of equity can pass upon his title I doubt very

much, but maybe the court of equity could look at his title in exercising its power in protecting the City and the officials of the City and the property of the City, but that is another question.

I have given you my views, the best I have been able to reach, up to the present time, although I am perfectly conscious that they are views that I might very readily depart from after further thought. For a considerable time I thought I ought to sustain the demurrer, but after studying it over very carefully yesterday, I reached the conclusion which I have stated to you. The bill should be amended and if Mr. Marchant demurs, I will overrule his demurrer. I will say further, if you conclude to ask the other judges to sit with me, I will have the case heard as soon as possible.

Mr. McKindless — We are perfectly willing to make the amendment which your Honor has suggested and are perfectly willing to go into a trial on the merits of the case just as promptly as it can be done. I might say, however, Monday I have a very important case over in the other court wherein I have witnesses already on the way from Duluth, and other distant points.

Mr. Marchant—I want to file an answer and I do not know whether your suggestion went to the point that you want other judges to sit with you in hearing that answer or not.

The Court—Yes, I will do that if that is what you want.

Mr. Marchant—Yes, I think we ought to go into the merits of the case.

The Court—If you conclude to bring your mandamus——

Mr. Marchant—I am not talking about the mandamus, your Honor, I am talking about filing an answer in this case. Would your Honor want the other judges to sit with you in hearing that?

The Court—If you gentlemen would prefer it. I will be very glad to ask Judge Bond and Judge Duffy to sit with me.

Mr. McKindless—We will be very glad to have them sit with your Honor.

Mr. Marchant—I can have my answer in by twelve o'clock, and I am ready to go to trial tomorrow morning or at any other time. I urge upon the Court, in view of the Court's remarks, the necessity of granting an early trial.

The Court—I certainly want to do that, but I have a great many people coming here tomorrow in another case.

Mr. Marchant—Of course, I do not intend that my request should interfere with the ordinary procedure of the Court. It will not take more than a couple of hours at the most to take the evidence in this case.

Mr. McKindless—I do not think a couple of hours will cover the evidence in this case, if I know anything about taking evidence, not if you are going to undertake to try to prove some of the things mentioned in your argument the other day, which we do not concede and do not agree with, so that might open up a very large question.

The Court—I will put the case in ahead of my docket next week.

Mr. Marchant—I understand that your Honor can not fix a day right now if you are going to ask the other judges to sit with you.

The Court—I will have to ask them first. They might not do it.

Mr. Marchant—I am not asking your Honor to fix an hour. I simply gave my expression to my willingness to go ahead any minute. I will have my answer filed in court very shortly, and have a copy served on the other gentlemen.

The Court—You gentlemen get your evidence all in line so you can go along rapidly. After that you can go on with the argument.

Mr. Marchant—Your Honor has indicated that this is a public question of importance. The rights of nobody have been settled. So far as Mr. Thompson is concerned, I will undertake to see that he does not transgress any of the things, or do any of the things your Honor has indicated he ought not to do.

The Court—I did not say that he would.

Mr. Marchant—There are things that might be inferred from your Honor's statement that he ought not to do, and I will see he does not do any of those things. I imagine that situation will progress, as it is progressing now, until we dispose of the case.

The Court—I know under your advice that nothing will be done in that matter.

Mr. Marchant—I shall not permit Mr. Thompson to abuse any of his powers, whether they are real powers, in my judgment or not, certainly not until this case is finally disposed of, and in order to make myself clear, I will make that to mean until it went to the court of last resort, if it is going there. I do not believe in trifling with rights that are going to be determined until they are determined.

The Court—I think we ought to know whether he is entitled to this office. If he is he ought to have it, and if he is not, he ought not to have it. We have enough confusion in the world as it is, without adding to it.

Mr. McKindless—I feel the same way about it, your Honor.

Mr. Marchant—I will file my answer right away.